**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**

**ANNA MARIA COOK,**

**Plaintiff,**

**v.**                                                  **CIVIL ACTION NO.: 2:16-CV-85
(JUDGE BAILEY)**

**NANCY A. BERRYHILL,
Acting Commissioner of Social Security,**

**Defendant.**

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On October 13, 2016, Plaintiff Anna Maria Cook ("Plaintiff"), by counsel Jan Dils, Esq.,

Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant

Nancy A. Berryhill, Acting Commissioner of Social Security[1] ("Commissioner" or

"Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g). (Compl., ECF No. 1).  On December 14, 2016, the Commissioner, by counsel Helen

Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative

record of the proceedings.  (Answer, ECF No. 6; Admin. R., ECF No. 7). On February 13, 2017,

and March 15, 2017, Plaintiff and the Commissioner filed their respective Motions for Summary

Judgment.  (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 11; Def.'s Mot. for Summ. J.

("Def.'s Mot."), ECF No. 13).   Following review of the motions by the parties and the

---

[1] After this suit was filed, but before this Report and Recommendation was entered, Nancy A. Berryhill replaced
Commissioner Carolyn W. Colvin as the Acting Commissioner of Social Security. Accordingly, pursuant to Rule
25(d), Fed. R. Civ. P., and 42 U.S.C. § 405(g), Nancy A. Berryhill is substituted for Carolyn W. Colvin.

administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   <u>PROCEDURAL HISTORY</u>

On December 10, 2012, Plaintiff protectively filed her first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on May 27, 2011 (R. 228).   Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through December 31, 2015; therefore, Plaintiff must establish disability on or before this date. (R. 247).   This claim was initially denied on March 7, 2013 (R. R. 149) and denied again upon reconsideration on April 30, 2013 (R. 160). On May 22, 2013, Plaintiff filed a written request for a hearing (R. 166), which was held before United States Administrative Law Judge ("ALJ") Terrance Hugar on August 25, 2014 in Wheeling, West Virginia. (R. 47).   Plaintiff, represented by Ross Miltner, Esq., appeared and testified, as did Linda Dezack, an impartial vocational expert. (<u>Id.</u>). On October 23, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 17). On August 16, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1).

## III.   <u>BACKGROUND</u>

### A.   **Personal History**

Plaintiff was born on July 9, 1958. (R. 219). She was fifty-two (52) years old on the alleged date of onset; fifty-four (54) years old at the time she filed her claim, (R. 226), and fifty-six years old at the time of the hearing (R. 77). Her highest level of education obtained was listed

as a General Equivalency Diploma (GED), (R. 251), though she testified at the hearing that she also had an Associate's Degree in accounting she had gotten some time ago ("1990-ish"). (R. 64). Plaintiff's prior work experience included working with the Red Cross from March 2007 to June 2008; customer service from December 1990 to April 2001, caretaker from September 2008 to August 2002; secretary for National Trappers Association from April 2001 to August 2002; telemarketer with Interactive Teleservices from October 2002 to January 2008. (R. 251). She was divorced  at the time she filed her initial claim (R. 226) and was divorced at the time of the administrative hearing. (R. 47). She had three children, two still living, none dependent or under the age of eighteen. (R. 227). Plaintiff alleges disability based on high blood pressure, compression fracture on her T-12 vertebra, arthritis in her hands, fingers, hips and knees, "neck problems," bulging and herniated discs, depression, anxiety, and tinnitus. (R. 115).

## B.    Medical History

### 1.   Medical History Summary

Because "[t]he issues in this case are primarily legal issues and do not turn on the medical evidence," (Pl.'s Br. at 6), the entirety of Plaintiff's medical history is not recited at length here, but summarized for the sake of brevity. A review of the disability determinations and medical opinions relevant to the parties' arguments follows.

In May 2011, while Plaintiff was driving a client as part of her job, the client kicked Plaintiff in the back of her head causing Plaintiff to have an accident. Subsequently, Plaintiff was determined to have a cracked T12 vertebra in her back and neck problems which she described as a "straightening," or loss of neck curvature. Plaintiff saw Dr. Blum as her general practitioner and primary care physician from August 10, 2010 to March 22, 2012. (R. 524-47). She was also seeing Dr. Wayt from June 2011 to January 2012. (R. 494-523). Plaintiff further saw Dr. Blum

as her primary care physician, and who adjusted her medications for both mental and physical conditions. (R. 779-82). Plaintiff eventually began seeing Dr. Shramowiat at the Mountaineer Pain and Rehabilitation Center in January 2013. (R. 720-38; 764-82). In addition to her physical injuries, Plaintiff reported experiencing anxiety and panic attacks and developing a fear of driving as a result of the accident; Plaintiff further had depression prior to the accident which continued afterward. She saw a counselor for these issues for a brief period from August 22, 2012 to September 7, 2012. (R. 701-04). Plaintiff reported that these counseling sessions ended because the therapist was only partially available due to having to drop off and pick up her daughter from practice, and could only meet with Plaintiff for twenty minutes each session. (R. 66).

### 2.   Medical Reports/Opinions

On January 25, 2012, agency reviewer Rabah Boukhemis, M.D., reviewed Plaintiff's records and attempted to complete a physical residual functional capacity ("RFC") assessment. (R.84). Reviewer Boukhemis noted that because Plaintiff had not returned forms, there was "insufficient evidence." Id. Likewise, on January 24, 2012, agency reviewer James Bartee, Ph.D. was unable to complete a psychiatric review technique ("PRT") and noted "insufficient evidence to substantiate the presence of a disorder" because Plaintiff had failed to return forms. (R. 83). Consultative evaluations were also needed.

### a.   *Psychological Evaluation*

On July 31, 2012, Licensed Psychologist Ronald Rielly, Ed.D. conducted a psychological evaluation of Plaintiff. (R. 681-689). The evaluation consisted of an interview, social history, clinical interview, mental status assessment, and administration of a series of psychological tests

(including the Kaufman Brief Intelligence Test II, the Millon Clinical Multiaxial Inventory III, the Beck Depression Inventory II, and the Beck Anxiety Inventory). (R. 681).

Rielly's mental status assessment of Plaintiff indicated that she was not confused or disoriented; however, she was "somewhat distracted and had difficulty concentrating during the interview." (R. 683). Remote memory was unimpaired. Id. Overall intellectual functioning was average. Id. Thought process was normal. Id. Insight and judgment were adequate. Id. Thought content was normal. Id. As to mood and affect, Rielly noted that Plaintiff reported constantly feeling "deeply depressed, [and that] her feeling of sadness, unhappiness, and depression cause impairment of functioning in many areas." (R. 684). She also seemed anxious and reported "constant anxiety accompanied by severe autonomic symptoms." Id. No psychomotor retardation or indications of euphoria were observed. Id. Dr. Rielly observed that Plaintiff "exhibited moderate flattening of affect," reacting with emotion "only occasionally." Id. He noted that the "absence of emotional contact" prevented him from establishing rapport, and that Plaintiff was restless and had difficulty sitting still during the interview. Id. Plaintiff reported sleeping more than ten hours per day and feeling "irritable or grumpy" lately. Id. Plaintiff's appearance was adequate, and no unusual behaviors, mannerisms, or posturing were observed. Id.

Plaintiff's scores on the Kaufman Brief Intelligence Test II indicated average intellectual functioning. (R. 684). Plaintiff's raw score of 50 on the Beck Anxiety Inventory indicated severe anxiety. Id. Plaintiff's raw score of 52 on the Beck Depression Inventory II indicated severe depression. Id. Results of the Millon Clinical Multiaxial Inventory III (MCMI-III) indicated that Plaintiff's responses were valid and reliable. (R. 685). Results of the MCMI-III indicated the "probable presence of a severe mental disorder, at least one moderate clinical symptom disorder and a severe personality disturbance." Id. Dr. Rielly's diagnostic impressions included Major

Depression, recurrent, with psychosis; General Anxiety disorder, and a Global Assessment of Functioning Scale score of 50. (R. 688).

### b. *Psychiatric Evaluation*

On August 6, 2012, Steven Corder, M.D. completed a psychiatric evaluation of Plaintiff upon referral from the West Virginia Department of Health and Human Resources pursuant to Plaintiff's application for adult Medicaid. (R. 690 - 693). Dr. Corder conducted a mental status assessment. He noted that Plaintiff was casually dressed and fairly well groomed, though a "little unkempt in her appearance." (R. 692). Eye contact was established and maintained. Id. Plaintiff's speech was spontaneous, copious, and rambling in a slightly tangential fashion; her answers were vague and tangential, but was able to be redirected and gave direct answers appropriately. Id. No statements were bizarre, delusional, or inappropriate. Id. No evidence of psychotic thinking was apparent. Id. Plaintiff reported passive suicidal thoughts but denied a desire to carry them out or harm herself. Id. Plaintiff was not guarded or suspicious, and her affect was reactive and labile. Id. Dr. Corder noted that Plaintiff at times joked and appeared relaxed and carefree, while at other times she cried uncontrollably and appeared distraught and tense. (R. 693). Cognition was intact, and intellect was average. Id. Plaintiff was oriented to person, place, and time. Id. Dr. Corder noted that Plaintiff performed simple calculations with good speed, except for subtraction which she performed slowly. Id. Plaintiff interpreted proverbs concretely. Id. Her judgment was intact. Id. Immediate recall was adequate. Id.

Dr. Corder's diagnoses included Major Depressive Disorder, moderate, recurrent, without psychosis; Post-Traumatic Stress Disorder, chronic; Panic Disorder without agoraphobia; a possibility of Dysthymic Disorder, and a Global Assessment of Functioning score of 35. (R. 693). Dr. Corder noted that Plaintiff felt medication was working for her, but also felt she needed

psychotherapy as well. Id. He concurred in that, stating he felt psychotherapy was "an important part of her treatment" given her diagnoses. Id. Dr. Corder opined that Plaintiff's prognosis was poor, given her chronic pain depression syndrome and underlying chronic difficulties. Id.

### c.  *Mental Status Examination*

On February 4, 2013, Holly Coville, MA., Ed.S., completed a consultative mental status examination of Plaintiff. (R. 705-709). Coville's review of Plaintiff's records included "an Adult Function Report, and two pages of a doctor's progress note from 2012." (R. 706).

Coville observed that Plaintiff's gross and fine motor functioning appeared intact, though she walked slowly with a stiff gait. (R. 705).  Plaintiff's dress was casual, and her hygiene was adequate. Id. Plaintiff's attitude and behavior were described as "cooperative, but complaining.' (R. 707). Her speech was rambling; she answered questions with detailed stories. Id. Plaintiff was oriented to time, place, person, and circumstance. (R. 708). Her mood was depressed, and her affect was "irritable and consistent with mood." Id. Concentration was mildly impaired pursuant to a Digit Span score of 7. Id. Thought processes were relevant and coherent, with no evidence of delusions. Id. Insight and judgment were both mildly impaired. Id. Immediate memory was within normal limits; recent memory was mildly impaired, and remote memory was "within normal limits to mildly impaired." Id. Persistence was "within normal limits to mildly to moderately impaired, based on the ability to stay on task." Id. As to pace, Coville wrote that "flow of the evaluation is slightly affected by some of the aforementioned issues." Id.

Social functioning was mildly affected based on Coville's interactions with Plaintiff during the interview. (R. 708). Coville diagnosed Major Depressive Disorder, recurrent, mild. Id.. (Coville did not assign or mention a Global Assessment of Function score.) As to activities of daily living, Coville did not indicate to what degree she felt they were limited; writing only

that Plaintiff reported "need[ing] help with household chores [and] has been experiencing problems with bathing." (R. 709). As to social activities, Coville wrote the word "Limited." Id. Coville considered Plaintiff's prognosis to be fair, in terms of mental health. Id.

### d.  *Consultative Examination (Physical)*

On February 26, 2013, Thomas Schmitt, M.D. completed a consultative physical examination of Plaintiff "for evaluation of hypertension and orthopedic status." (R. 714). Dr. Schmitt noted that he had no medical records to review in so doing. (R. 717). Dr. Schmitt noted that Plaintiff had a history of hypertension, but it was controlled by medications. (R. 714). He noted no history of CVA, hypertensive crises, renal insufficiency, or congestive heart failure, or cardiac enlargement. (R. 717). Plaintiff had a history of pain of the lumbar spine radiating to the right lower leg, lasting several years. (R. 714). Dr. Schmitt observed an MRI in February 2011 revealed "bulging discs at several levels of the lumbar spine," but that opioids have provided "some relief." Id. He noted no history of deformities, heat, redness, swelling, enlargement effusion, morning stiffness, or tenderness in Plaintiff's joints. Id. On musculoskeletal evaluation, Plaintiff was able to get on and off the examining table without difficulty; heel and toe, squatting, and hopping movements were all normal, and the straight leg raising test was negative bilaterally. (R. 716). There was "free and full range of motion in all joints." Id. Dr. Schmitt's diagnostic impressions included "multiple arthralgias" and chronic low back syndrome, but did not indicate what if any limitations he felt Plaintiff had as a result those conditions. Id.

### e.  *Disability Determination at the Initial Level*

Subsequently, SSA again attempted an initial disability determination following completion of consultative examinations. Plaintiff was found to have one severe impairment –

"other and unspecified arthropathies" – and three non-severe impairments: essential hypertension, anxiety disorder, and affective disorder. (R. 99).

On February 25, 2013, Joseph Shaver, Ph.D. reviewed Plaintiff's records and completed a Psychiatric Review Technique ("PRT") assessment. (R. 99). Dr. Shaver considered Plaintiff under listings 12.04 (affective disorders) and 12.06 (anxiety disorders), for which there was insufficient evidence to establish presence of the "C" criteria. Id. Shaver found that Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. Id. Shaver noted the following additional explanation as to his PRT:

> [Plaintiff] is alleging a mental disability on the basis of anxiety and depression. [Plaintiff] also reports suffering from [high blood pressure], arthritis, and bulging discs. [Mental Status Evaluation] (2/4/13) rated immediate/remote memory, persistence and social functioning as falling essentially [within normal limits] with concentration being only mildly impaired. Significant limitations in [Plaintiff's activities of daily living] appear to be secondary to her physical condition. [Plaintiff] fixes easy foods, folds laundry, grocery shops and handles personal finances when she has the resources to do so. It is believed that [Plaintiff] possesses the mental capacity to engage in gainful work-like activity on a sustained basis.

Id.

On March 7, 2013, Jonathan Merrifield reviewed Plaintiff's file and found the following exertional limitations: Plaintiff could occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; stand, walk, and/or sit for about six (6) hours in an eight (8) hour workday; and could perform unlimited pushing and/or pulling subject to her lift/carry restrictions. (R. 101). Reviewer Merrifield found no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. (R. 101). Merrifield's additional explanation for the RFC noted:

>    Capable of full range of medium work. DDD in C spine shown on imaging. 20% anterior
>    compression fracture of T12. Claimant is able to walk on heels, toes and in tandem.
>    Negative SLR, no muscle wasting, full ROM, adequate strength.

(R. 101). Merrifield found that Plaintiff was not limited to unskilled work, and was capable of

medium work based on the seven strength factors of the RFC. (R. 102). Although Plaintiff's

impairments could reasonably be extended to produce her pain or other symptoms, Plaintiff's

statements about the intensity, persistence, and functionally limiting effects of the symptoms

were found to not be substantiated by the objective medical evidence alone. (R. 100). Plaintiff

was found partially credible, with the most informative factors listed as her activities of daily

living, and the precipitating and aggravating factors. Id.

### f.   *Disability Determination at the Reconsideration Level*

On reconsideration, Plaintiff was determined to have two severe impairments – "other

and unspecified arthropathies," and "spine disorders" – and three non-severe impairments –

essential hypertension, anxiety disorder, and affective disorder. (R. 121).

On April 29, 2013, agency reviewer Fulvio Franyutti , M.D. reviewed the prior RFC and

noted the following: "4/18/13 D. Blum M.D. Treating Physician. Great Weight. Claimant able to

lift 20 lbs (light RFC). I agree with above." (R. 121). Franyutti found the following exertional

limitations: Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift

and/or carry ten (10) pounds; stand, walk, and/or sit for about six (6) hours in an eight (8) hour

workday; and could perform unlimited pushing and/or pulling subject to her lift/carry

restrictions. (R. 124). Franyutti found no manipulative limitations, no visual limitations, and no

communicative limitations. Id. As to postural limitations, Franyutti found that Plaintiff could

occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds due to her "morbid

obes[ity] (weight 291 lbs)"; and occasionally balance, stoop, kneel, crouch, and crawl. Id. No

manipulative, visual, or communicative limitations were found. Id. As to environmental limitations, Plaintiff should avoid even moderate exposure to hazards, machinery, and heights, but could have unlimited exposure to wetness, humidity, noise, and vibration, extreme temperatures, fumes, odors, dusts, gases, poor ventilations. (R. 125). Franyutti provided the following additional explanation for the RFC: "Capable of full range of light work DOD inc spine shown on imaging, 20% anterior compression fracture of T 12. Claimant is able to walk on heels, toes and in tandem, no muscle wasting, full [range of movement], adequate strength." Id.

On April 29, 2013, agency reviewer Jim Capage, Ph.D., reviewed the prior PRT assessment and affirmed it as written. (R. 122).

### g.  *Medical Questionnaire (Treating Physician)*

On August 5, 2014, Michael Shramowiat, M.D., who Plaintiff saw for pain management, completed a Medical Questionnaire as to Plaintiff's limitations based on pain. (R. 779-782). His diagnoses included pain in Plaintiff neck, thoracic spine, low back, knee, and leg. (R. 779). He opined that Plaintiff's impairments have last or can be expected to last at least twelve months. Id. Dr. Shramowiat noted that Plaintiff's impairments were supported by diagnostic findings including a cervical CT on May 27, 2011 showing arthritic changes consisting of spondylosis, a lumbar MRI on June 24, 2011 showing T-12 compression and disc bulging at L1-2 through L5-S1; a cervical MRI on June 24, 2011 showing mild disc bulging at C3-4, C5-6, C6-7, 7-T1, and T1-2; and a thoracic MRI on July 6, 2011 showing mild subacute benign compression fracture at T12. (R. 779). Dr. Shramowiat opined that Plaintiff's reports of the degree and type of pain she experienced were reasonable given her conditions and supported by the diagnostics and imaging. (R. 780). Plaintiff's pain was aggravated by lifting over twenty pounds, twisting and turning, and

sweeping. Id. Dr. Shramowiat opined that Plaintiff suffered from moderate pain that was not related to a chronic pain syndrome. Id.

Dr. Shramowiat opined that Plaintiff had deficiencies of concentration, persistence or pace as a result of her pain that resulted in a frequent failure to complete tasks in a timely manner. (R. 780). He opined that Plaintiff's symptoms were occasionally severe enough to interfere with attention and concentration needed to perform even simple tasks. (R. 781). He opined that Plaintiff could not return to her previous work, but could handle a low stress job. Id. She would need the opportunity to shift at will from sitting or standing/walking. Id. He opined that Plaintiff could not lift over twenty pounds, would need limited walking/standing, no overhead reaching, limited bending, stooping, crouching, and pushing/pulling. (R. 782). His findings were supported by both Plaintiff's subjective complaints and the diagnostic evidence. Id. Dr. Shramowiat anticipated that Plaintiff would need to be absent from work about two days per month. Id. He opined Plaintiff would be unable to complete a full-time work schedule. Id.

## C.    Testimonial Evidence

At the hearing held on August 25, 2014, the ALJ began by asking Plaintiff about her previous work. (R. 51). Plaintiff testified that up until the date of her car accident, she was employed as a caretaker for "individual[s] unable to care for themselves." (R. 52). In this position, she was responsible for taking her clients to doctor's appointments, taking them for walks, helping them with grocery shopping, medications, bathing, cooking, cleaning, and "regular household duties." (R. 52-53). Previously, she had also worked as a telemarketer for both the Red Cross and ECCW Teleservices. (R. 53). She also did sales calls, filing, and took custom window orders at Sprauss Building Products. Id.

Plaintiff testified as to her medical history. Her current medical problems included a cracked T12 vertebra and neck injury pursuant to a car accident, tinnitus, manic depression, arthritis in her hands and hips. As to her back, Plaintiff testified that she cannot sit for long periods of time because her back will hurt until she can recline and take the weight off of it. (R. 55). Plaintiff estimated that she could sit for "10 or 15 minutes" before her back would start to hurt (R. 60). The pain often gets bad enough that she cannot focus on what she is doing. Id.

As a result of her difficulty sitting, she has problems driving a car, working at a desk, or using a motorized shopping cart at the grocery store. (R. 55). Plaintiff testified that she has only driven "once in maybe two [or] three months." (R. 59). She has asked about surgery, but was told it was not an option for her. Id. She was given a back brace about "a month or so" after her accident, but it did nothing for her back. (R. 58). Plaintiff was also prescribed a Transcutaneous Electrical Nerve Stimulation (TENS) Unit, which does help with the pain if she turns it on a high setting. Id. Problematically, at that level, it also causes her legs to be numb, so she cannot walk when she uses it. Id. She takes prescription pain medication. (R. 59).

As to her mental impairments, Plaintiff testified that she had had three panic attacks in the past week, though that is more frequent than usual. (R. 61). She typically has panic attacks "occasionally." Id. Plaintiff had attempted mental health counseling within the past year, but it "didn't work out very good" with that particular therapist. (R. 62). She had between three to five appointments with a mental health counselor, who regularly arrived late to their appointments and left early, so Plaintiff concluded she "needed to see somebody else." (R. 65-66).

Plaintiff also testified regarding her daily activities. She stated that she sometimes has trouble taking care of things around the house. (R. 62). As an example, Plaintiff testified that

recently she had "a really bad week and . . . didn't take a shower or wash [her] hair for about a week;" her daughter had to come help her shower. Id.

### D.    Vocational Evidence

Also testifying at the hearing was Linda Dezack, a vocational expert.  Ms. Dezack characterized Plaintiff's past work with the Red Cross as a blood donor recruiter, DOT code 293.357-010, with a specific vocational preparation ("SVP") of "three or low semiskilled." (R. 69). The VE testified that the exertional level is light as the job is generally performed, but sedentary as Plaintiff actually performed it. Id. VE Dezack testified that Plaintiff's work at Sprauss was a compound job: fifty percent (50%) data entry clerk, and fifty percent (50%) telemarketer. (R. 69-70). However, VE Dezack's testimony as to the data entry clerk job (DOT code 203.582-054) was conflicting:

> A    At Sprauss, she worked a compound job. 50 percent as a data entry clerk. Recognized DOT code is 203.582-054. Skill level is **four or high semiskilled**. The exertional level **as generally performed** is at the **sedentary** level, **as well as actually performed**. She worked the other 50 percent --
> Q    Excuse me. What's that? Could you repeat the classification on that again?
> A    Yes. The skill level **three, low semiskilled**. **Light exertional level as generally performed**, but **sedentary as actually performed.**
> Q    Okay.

(R. 69-70). VE Dezack thus testified that the data entry job had an SVP of "four or high semiskilled," then a moment later, that the SVP was "three, low semiskilled;" likewise, first that the data entry job had an exertional level of "sedentary" as generally and actually performed, then that the exertional level was "light as generally performed, but sedentary as actually performed." Id.[2] VE Dezack testified that "the other 50 percent of the time, she worked as a telemarketer," DOT code, 299.357-014, skill level "three or low semiskilled," and sedentary exertional level both as generally and actually performed. (R. 70). This same job title and

---

[2] It is thus unclear which of these competing descriptions are what VE Dezack actually intended as to the data entry clerk job, though the discrepancy does not appear to be at issue regarding the parties' arguments.

information also applied to Plaintiff's work at Interactive Teleservices. Id. Plaintiff's work as a caretaker was classified as a "home health aide," DOT code 354.377-014, with an SVP of "three or low semiskilled," and an exertional level of "medium as generally performed, but heavy as actually performed." (R. 70).

With regards to Plaintiff's ability to return to her prior work, Ms. Dezack gave the following responses to the ALJ's hypothetical:

> Q   Ms. Dezack, I'd like you to assume a hypothetical individual with the past jobs you just described. Further assume the individual is limited to work at the light exertional level, except the work is with occasional postural, except no crawling or climbing of ladders, ropes or scaffolds and no exposure to hazards such as unprotected heights and moving mechanical parts. No concentrated exposure to vibration. No overhead reaching. Can the hypothetical individual perform any of the past jobs you described as actually performed or generally performed in the national economy?
>
> A   Based upon the hypothetical, the individual would be able to perform the blood donor recruiter, as customarily performed and as actually performed, the data entry clerk, as customarily performed and actually performed, the telemarketer, as actually performed and customarily performed.
>
> Q   Can a hypothetical individual perform any other work, and if so, can you give me a few examples?
>
> A   Based upon the hypothetical, the individual would be able to perform, in addition to those jobs, the following jobs. DOT number 211.462-010. Cashier. Light exertional level. Two SVP. 20,830 regional jobs. 3,314,010 national jobs. Next, DOT number 309.687-010. Companion. Light exertional level. Three SVP. 1,140 regional jobs. 398,045 national jobs. Third, DOT number 372.877-022. Flagger. Light exertional level. Two SVP. 240 regional jobs. 68,000 national jobs.

(R. 71-72). Incorporating the above hypothetical, the ALJ then questioned VE Dezack regarding Plaintiff's ability to perform other work at varying exertional but unskilled levels.

> Q   Ms. Dezack, now for the second hypothetical, I'd like you to consider a hypothetical individual with all the same limitations as the first hypothetical, but now with the additional limitation that the individual would be limited to simple, routine and repetitive tasks. Not able to perform at a production rate pace, but can perform goal oriented work. With this additional limitation here in hypothetical number two, can the individual still perform the past jobs that you stated were available at hypothetical number one?
>
> A   No. No PRW.

Q     What about the three new occupations that you listed of cashier, companion, flagger? Are those available here in hypothetical number two?

A     Cashier would be. Flagger would be. Companion would be eliminated, as that would be semiskilled and not unskilled.

Q     Can you replace then that with another occupation?

A     Yes. DOT number 237.367-018. Information clerk. Light exertional level. Two SVP. 3,930 regional jobs. 2,625,385 national jobs.

(R. 72). Finally, the ALJ questioned VE Dezack about Plaintiff's ability to work if she is completely credible as to the severity of her condition:

Q     Ms. Dezack, for the third hypothetical, consider a hypothetical individual with all the same limitations as in hypothetical number one and number two, but now with the additional limitation that the individual's work must entail no more than occasional interaction with supervisors, coworkers and the public. With this additional limitation here in hypothetical three, can the individual still perform those three occupations you listed that were available in hypothetical number two?

A     The information clerk would be eliminated. The flagger would be eliminated, and the cashier. All three would be eliminated.

Q     All right. Are three other occupations available at this list here in hypothetical three?

A     Yes . . . DOT number 728.684-022. Wire worker. Light exertional level. Two SVP. 150 regional jobs. 129,000 national jobs. Next, DOT number 787.685-010. Sewing machine operator. Light exertional level. Two SVP. 300 regional jobs. 158,000 national jobs. Third, DOT number 361.687-014. Laundry sorter. Light exertional level. Two SVP. 438 regional jobs. 100,000 national jobs.

Q     Ms. Dezack, are you familiar with the term or does it have a vocational reference of detailed work?

A     In vocational terms, it's not described. It's not a vocational --

Q     There's not a vocational description or meaning of the word detailed work or detailed work?

A     No.

Q     Ms. Dezack, I asked you in hypothetical number one about a hypothetical individual restricted to work at the light exertional level, and you listed [INAUDIBLE] past jobs that were available, and some were at the sedentary exertional level. So, if the individual was restricted to work at the sedentary exertional level, then those jobs that you classified at sedentary would be available, is that correct?

A     Yes.

Q     Ms. Dezack, how much time is allowed off task for jobs in the economy?

A     10 percent of the time or 6 minutes at 60 . . .

Q     And how many unexcused or unscheduled absences do employers customarily tolerate from their employees per month?

A     One to two days.

> Q       And how many routine rest or break periods do employers customarily permit
>         their employees per day?
> A       Three breaks.
> Q       And is your testimony consistent with the Dictionary of Occupational Titles?
> A       Yes.

(R. 75-76). Plaintiff's attorney questioned VE Dezack when provided the opportunity:

> Q       First of all, Ms. Dezack, would there be any transferrable skills from the past
>         relevant work that you cited?
> A       Yes. There would be from the home health aide.
> Q       Would that be something that could be transferred to a sedentary occupation with
>         little or no vocational training that would be required?
> A       Not to the sedentary level.
> Q       What levels would it be transferrable to, in your opinion?
> A       To the light.
> Q       To the light. Then finally if the individual in question were going to miss on
>         average of two days per month, due to various symptoms or would be unable to
>         complete a 40-hour typical work week, would there be any jobs that you'd be able
>         to name?
> A       No.

(R. 76-77). Lastly, Plaintiff's counsel gave a brief statement when prompted:

> ALJ:    Did you have anything at all further to say before I close the hearing?
> ATTY:   Just, Your Honor, I'd like to just point out the fact that the claimant is now 56
>         years old, and I think that based on the testimony and Ms. Dezack's opinions,
>         when the mental effects are factored in, I think that she would grid out with a light
>         profile, with either the simple, routine, repetitive task or the occasional interaction
>         under hypothetical two or three that you added in would preclude all employment,
>         and as of 55, I believe she would grid.

(R. 77).

## E.    Disability Report Forms

On an undated Disability Report Form, Plaintiff reported being treated by Dr. Michael

Shramowiat at the Mountaineer Pain Clinic, who prescribed her hydrocodone for pain. (R. 279).

She had seen Dr. Michael Wayt from May 2011 to December 2011. (R. 283). Plaintiff also

treated with Dr. Donald Blum as her regular primary care physician. Id. She had also seen a

chiropractor, Dr. Pagano, From May 2011 to August 2011. (R. 282).

On a subsequent Disability Report Form (appeal) dated March 28, 2013, Plaintiff reported no change in her conditions since the last report. (R. 288). At that time, Dr. Blum was prescribing her blood pressure and depression/anxiety medication; while Dr. Shramowiat was prescribing her Mobic for inflammation, Norco for pain, and Robaxin (a muscle relaxer). (R. 291).

On May 22, 2013, Plaintiff reported that her depression and anxiety were getting worse, and that she was having more knee and neck problems ("cannot stand or walk for any amount of time"). (R. 311-313). She reported that these had worsened around April 1, 2013. Id.

**F.     Lifestyle Evidence**

An adult function report dated December 19, 2012 was completed by Plaintiff's daughter, Angela Bennett, who helped Plaintiff. (R. 275). Plaintiff reported that her back pain affects her in that she is "unable to stand more than 10-15 minutes," cannot stand at [the] sink to wash dishes, cannot stand in [the] shower to wash [herself], cannot sit straight [or] sleep in [a] bed." (R. 268). As a result, she has to spend most of her days in the recliner. Id.

As to daily activities, Plaintiff reported that she tries to get a shower if she is not in too much pain – on average, one to two times per week. (R. 269). She then sits in her recliner until her back spasms subside. Id. Plaintiff's daughter has to bathe her dog. Id. Before, she was able to work, play with her grandchildren, drive, cook, clean, take care of her dog, bathe every day, shave, lift things, hunt, and climb stairs. Id. Now, some days she cannot dress herself; many days, she cannot bathe herself – her daughter washes her hair for her. Id. She has stopped shaving because she cannot bend over long enough to do it. Id. Some days, she has difficulty cleaning herself properly after using the toilet. Id. Plaintiff sometimes makes herself food, but it

is limited to toast, cheese sandwiches, or cereal because she can no longer stand over the stove long enough. (R. 270).

Plaintiff reported that she can fold clothes once a week for thirty minutes, but has to take breaks. (R. 270). Her roommate has to help "some," and her daughter helps her "a lot." Id. She does not do house or yard work beyond that because it is painful. (R. 271). Plaintiff reports that she goes outside once a month "if that," because of her back pain. Id. She does not go out alone because she is afraid she will have a back spasm while driving and cause an accident. Id. Driving also causes her to have panic attacks. Id. She reported that she could manage her finances if she had any money. Id.

Plaintiff used to enjoy hunting, nature trails, hiking, swimming, and fishing. (R. 272). Twice, her daughter drove Plaintiff and a chair to the water so she could fish. Id. Otherwise, she has not been able to do any of those things any longer. Id. As to social activities, Plaintiff talks regularly on the phone, but does not go anywhere on a regular basis. Id. She cannot go to church or see her friends because she cannot sit in hard seats. Id.

Plaintiff reported that she can lift two pounds, cannot squat or kneel, can only bend sometimes, can rarely reach, can stand for five minutes and sit for twenty minutes, can climb two steps, has trouble concentrating and completing tasks due to pain, and has trouble using her hands due to arthritis. (R. 273). Plaintiff can walk for twenty minutes on "really good days," and must rest for five minutes. Id. She reported following written and spoken instructions well. Id. Plaintiff reported that she does not handle stress well, and "ha[s] had to manage" changes in her routine. (R. 274). She reports using the "electric wheelchair" at WalMart when available at the store. Id.

As to medications, Plaintiff takes Hydrocodone for pain, which makes her very sleepy and constipated. (R. 275). She takes Sertraline and Meloxicam with no side effects. She also takes Lisinopril, which makes her sweat a lot. Id. In the "Remarks" section, Plaintiff added that she gets dizzy a couple of times per day since her accident, and also has problems with her left leg and tendonitis. Id. She reports being unable to play with her grandchildren any more or carry them. Id. Arthritis in her hands makes her drop things. Id.

On a second Adult Function Report form dated April 12, 2013 (R. 293-300), Plaintiff reported that she was unable to care for herself "most days." (R. 293). She could not stand for longer than a few minutes, and was unable to sit in a normal chair. Id. She continued to experience pain in her back, weakness in her left leg, and weakness and stiffness in her fingers that caused her to frequently drop things. Id. She reported it was "very hard to hear anything" because of the tinnitus (ringing in her ears). Id. She reported incontinence and wetting herself daily. Id. She also reported being "very dizzy several times a day and night," as well as fear of driving. Id.

As to daily activities, Plaintiff wrote:

Most days: I remain in the clothes I slept in. Difficult to wipe properly. Eat cereal or toast. Sit on recliner with closed caption on TV. Take pills. Cry. Ice or heat on back/hips. Try to sleep, nap. Call daughter [to] see if she is coming.

(R. 294). Most days, Plaintiff cannot lift her leg to change clothes, and get down into a tub to bathe. Id. She uses the shower only, reporting that she can "either wash hair or bath[e] fast." Id. She cannot always brush her hair due to weakness in her arms. Id. Her daughter gets her blood pressure medication out of the package for her, and she cannot pop them out due to weakness in her fingers. Id. She was still preparing basic, quick foods like sandwiches, toast, cereal, and frozen dinners, but sometimes drops things in the process. Id. She limited food preparation to "a

minute or less" since she had difficulty standing longer than "a minute or two." (R. 295). She was unable to use a knife or lean over to prepare anything more substantial. Id. Plaintiff reported that she could put clothes in the washing machine because it was directly in front of the toilet, which allowed her to sit while doing so. (R. 295-296).

She leaves her house to go grocery shopping one or two times per month. (R. 296). She spends fifteen minutes in the store before having to "sit in [her] car and rest [her] back and nerves, then try again." Id. Plaintiff that she is only able to see family and grandchildren once every two to three months on a day when her pain is not too bad. (R. 298). She reported now only being able to walk ten steps, "give or take," before needing to rest thirty second to a minute. (R. 298). She reported that she could not deal with people on bad pain days, and stress was contributing to her depression and panic attacks. (R. 299). She reported handling changes in routine "good, but this change from being active to sed[en]tary is very hard and sad." Id. In addition to her regular medications, Plaintiff now reported also taking Zoloft. (R. 300). In the "Remarks" section, Plaintiff added:

> "On very low pain days, 1-2-3 times a month, I sweep floor with sweeper until it starts hurting, then I stop. 10 minutes or less. If I don't stop, which I have tried, the pain gets worse and worse. Then, if I sit for a while, ½ an hour to an hour, I can get up and do a little more. This is on the [sic] 1-3 days a month or so."

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.
>
> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.   The claimant has not engaged in substantial gainful activity since May 27, 2011, the alleged onset date (20 CPR 404.1571 *et seq.,* and 416.971 *et seq.).*

3.      The claimant has the following severe impairments: degenerative disc disease of the cervical, thoracic and lumbar spine, obesity, and other arthropathies (20 CFR 404. 1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she should never crawl or climb ladders, ropes or scaffolds. She should only occasionally climb ramps and stairs, balance, stoop, kneel and crouch. The claimant should avoid all exposure to hazards such as unprotected heights and moving mechanical parts. She should avoid concentrated exposure to vibration. The claimant should not perform any overhead reaching.

6.      The claimant is capable of performing past relevant work as a blood donor receiver and data entry clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from May 27, 2011, through the date of this decision (20 CFR 404.1520(1) and 416.920(1)).

(R. 20-41).

# VI.    <u>DISCUSSION</u>

## A.    Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be

somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)).

However, "[w]e do not reflexively rubber-stamp an ALJ's findings," Lewis v. Berryhill, 858 F.3d 858, *870 (4th Cir. 2017). There are some things an ALJ must do in reaching and explaining his decision. An ALJ has a basic duty of explanation; his decision must be sufficiently explained to permit a court to meaningfully review it. Radford v. Colvin, 734 F.3d 288, *295-95 (4th Cir. 2013). Further, the ALJ must provide an "accurate and logical bridge" from the evidence to his conclusion. Monroe v. Colvin, 826 F.3d 176, *189 (4th Cir. 2016). An ALJ must "explicitly indicate[] the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, *235-36 (4th Cir. 1984). There are also some things an ALJ may *not* do in reaching a decision. An ALJ may not selectively "cherrypick facts that support [his decision] while ignoring relevant evidence [to the contrary]." Lewis, 858 F.3d at *869. Moreover, while an ALJ is not required to discuss *every* piece of evidence, Reid v. Commissioner, 769 F.3d 861, *865 (4th Cir. 2014), an ALJ excludes *relevant* evidence at his peril.

In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

B.    **Contention of the Parties**

Plaintiff, in her Motion for Judgment on the Pleadings, asserts that the Commissioner's decision "is contrary to the law and is not supported by substantial evidence." (Pl.'s Mot. at 1). Specifically, Plaintiff raises three legal arguments. First, Plaintiff argues that the ALJ erred in finding Plaintiff's mental impairment to be non-severe because he relied on the opinions of the two state agency psychologists, and a masters level psychologist, while rejecting the opinions of a doctoral level psychologist and psychiatrist. (Pl.'s Br. in Supp. of Mot. ("Pl.'s Br.") at 10, ECF No. 12). Second, Plaintiff argues that the ALJ failed to comply with 20 C.F.R. § 404.1527 in evaluating the psychological opinions of record because he failed to assign a weight to Dr. Corder's opinion, assigned less weight to the only medical source to have performed comprehensive psychological testing, and gave great weight to agency reviewers who did not appear to have considered Reilly's and Corder's opinions. (Pl.'s Br. at 12.) Third, Plaintiff argues that the ALJ failed to assign great weight to the opinion of Plaintiff's treating physician, Dr. Shramowiat, in violation of 20 C.F.R. §§ 404.1527(b) and 404.1527(d)(2). (Pl.'s Br. at 14). Plaintiff asks the Court to remand the case for proper consideration. (Id. at 15).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Defendant argues that the ALJ was justified in finding Plaintiff's depression and anxiety to be non-severe, and in omitting them from the RFC, because Plaintiff did not seek treatment for her depression or anxiety, and largely described her depression as well-controlled. (Def.'s Br. in Supp. Of Def.'s Mot. ("Def.'s Br.") at 1, ECF No. 14). Defendant further argues that Dr. Shramowiat's opinion is at odds with his treatment notes and with the notes of several other treating and examining sources, and the ALJ was correct to discount it. (Def's Br. at 2).

## C.  Analysis of the Administrative Law Judge's Decision

In summary, the ALJ favored the opinions of one psychological expert and two agency reviewers (who do not appear to have considered two opinions central to limitations) that were contradicted by two treating physicians and two psychological experts, whom the ALJ discredited for insufficient reasons. The undersigned finds that the ALJ's decision is legally insufficient and not supported by substantial evidence for a number of reasons. The ALJ erred by failing to explicitly indicate the weight assigned to opinion evidence in the record, and by failing to conduct a sufficient analysis of weight as directed by the regulations. As a result of these errors, the ALJ's determination that the Plaintiff's mental impairments were not severe is unable to be affirmed. Because no mental limitations were included in the RFC the ALJ fashioned, in combination with errors in weighting the opinions the error cannot be found harmless. Accordingly, the undersigned recommends this case be remanded for correction of errors below.

### 1.  The ALJ failed to comply with 20 C.F.R. § 404.1527 in evaluating the medical opinions of record.

The regulations, specifically 20 C.F.R. § 404.1527(c), discuss how medical opinions are weighed:

> *How we weigh medical opinions*.  Regardless of its source, we will evaluate every medical opinion we receive.   Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion:
>
> > (1) *Examining relationship*.  Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) *Treatment relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence

that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination*.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant

evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. § 404.1527(c).

With respect to the weighing of the psychological opinions of record, the ALJ assigned weight as follows: the ALJ afforded consultative examiner Holly Coville significant weight because "she is an expert in psychology, and her opinion is well supported by the mental status testing she performed, and is consistent with other mental health progress notes." (R. 38). Dr. Reilly was afforded "some weight" because "records of [Plaintiff's] treating physicians have

28

indicated that symptoms of depression and anxiety had greatly improved with medication." (R. 36). The ALJ afforded "little weight" to the GAF score of 50 given by Dr. Reilly, because GAF scores "are not necessarily an indication of the claimant's longitudinal functioning." Id. The ALJ likewise did not afford significant weight to the GAF score of 35 given by Dr. Corder for the same reason. (R. 37). The ALJ failed to specify how much weight, if any, was given to Dr. Corder's *opinion*. Id. Agency psychological reviewers Shaver and Capage were given "great weight" because they "are experts in psychology and had the opportunity to review all of the available medical evidence." (R. 40).

Plaintiff argues that "the ALJ relied on the opinions of the two state agency psychologists, and the opinion of a masters level psychologist – Holly Colville – and, for all practical purposes rejected the opinions of Dr. Reilly and Dr. Corder, in spite of stating that he gave Dr. Reilly's opinion 'some weight' and in light of failing to assign any weight to Dr. Corder's opinion." (Pl.'s Br. at 10). Defendant counters that "Plaintiff does not explain how the ALJ's RFC assessment should change if he had assigned greater weight to the opinions of Drs. Reilly and Corder, [as] Dr. Reilly did not describe any occupational limitations in his assessment, and noted Plaintiff's insight, judgment, thought content, cognition, and thought process to be largely normal (Tr. 683-84)." (Def.'s Br. at 13). Plaintiff responds that if Corder's opinion that Plaintiff suffered "both moderate and severe clinical syndromes" had been credited, it would have "translate[d] into at least SOME restrictions in . . . work-related mental limitations." (Pl.'s Rep. at 4) (emphasis in original).

### a. Consultative Examiner Holly Coville

The ALJ afforded consultative examiner Holly Coville significant weight because "she is an expert in psychology, and her opinion is well supported by the mental status testing she

performed, and is consistent with other mental health progress notes." (R. 38). The ALJ's first reason for crediting Coville is illogical, inasmuch as all of the psychological opinions in this record were written by medical personnel who were all experts in psychology. Moreover, as Plaintiff points out, Holly Coville was the only author of an expert psychological opinion in this record who did *not* hold a doctoral degree. As a result, "expertise in psychology" in fact supports all expert opinions in this record, does not weigh in favor of Coville any more than it does Rielly or Corder, and if anything, weight the least in support of Coville.

As to the ALJ's second reason, the logic of this conclusion is likewise unclear. While it may be fair to say that Coville's opinion is supported by the mental status examination she conducted, the same could fairly be said for Rielly and Corder, who also conducted mental status examinations. The same could doubly be said for Rielly, who conducted a series of comprehensive psychological tests that no other psychological expert in this record did – and those results supported *his* opinion. The ALJ's decision appears to indicate that only Coville enjoyed supportability from her own results, however, which is both an inaccurate implication and an inadequate explanation. See Salisbury v. Colvin, Civil Action No. 3:16-CV-173, ECF No. 15 at 35-37 (N.D.W.Va. Nov. 15, 2017) (adopted without objection in ECF No. 16) (ALJ's vague, perfunctory statement about a lack of supportability in rejecting the only psychological source to have performed psychological testing was insufficient).

As to the ALJ's third reason, the ALJ failed to meet his basic duty of explanation by generically and broadly declaring Coville's opinion was consistent with "other mental health progress notes" while neglecting to cite to a single note that allegedly supports her opinion. The undersigned cannot find the ALJ's decision to be supported by substantial evidence when it is not sufficiently explained to determine the rationale between the evidence cited and his

conclusions, with no logical connection apparent. <u>Monroe v. Colvin,</u> 826 F.3d 176, 190 (4th Cir.

2016). Under these circumstances, the "meaningful review" with which the court is tasked is not

possible. <u>Radford v. Colvin</u>, 734 F.3d 288 at *296 (4th Cir. 2013). As a result, none of the

reasons the ALJ provides for crediting Coville over the other psychological experts are valid.

Moreover, it is not apparent from the record that Coville's opinion *is* consistent with other

mental health progress notes, considered in their entirety.

### b.  Agency Reviewers Shaver and Capage

Agency psychological reviewers Shaver and Capage were given "great weight" because

they "are experts in psychology and had the opportunity to review all of the available medical

evidence." (R. 40). While technically correct, these reasons are insufficient for two reasons: first,

because *all* of the psychological sources in this record are experts in psychology, and second,

because there is no evidence that the agency reviewers considered the most probative

psychological evidence in this record – Dr. Rielly's report and opinion.

Defendant is correct that Dr. Corder's August 6, 2012 psychological opinion was noted

by the agency reviewer Shaver at the initial stage in the findings of fact, so it is clear that Shaver

did consider Corder's opinion:

> INITIAL ANAYLSIS-----------------------------------------
> MENTAL
> **08/06/12** Tended to ramble in tangential fashion Cognitively grossly intact Reactive and
> labile in affect Cognitively grossly intact Immediate recall WNL Concentration WNL
> Diagnosis of major depressive disorder, moderate, recurrent, without psychosis; panic
> disorder without agoraphobia; consider co-existing dysthymic disorder. GAF of 35.

(R. 120) (emphasis added). It is likewise clear that Coville's February 4, 2013 consultative

examination was also considered, as it too is noted and summarized, in the findings of fact and

Shaver's analysis:

**02/04/13 CE.** Appearance Anna Cook is a 54-year-old Caucasian female utilizing no adaptive equipment. Dress is casual. Hygiene is adequate. Ms. Cook is ambulatory, although she walks slowly and stiffly. Attitude and Behavior: Cooperative, but complaining. Speech: Rambling. Ms. Cook answers a question with a detailed story. At one point, she laughs and states, "I could write a book" Orientation: Exhibited to time, place, person, and circumstance. Mood: Depressed. Affect: Irritable and consistent with mood. Concentration: Mildly impaired, based on a Digit Span score of 7. Thought Processes: Relevant and coherent. Thought Content: No evidence for delusional systems, et cetera. Perceptual: Ms. Cook states that as a child, she frequently thought she heard her name being called, to the point that she states that her mother put a phone in her room, saying she would call her on the phone if she really needed her. She complains that now, she sees shadows out of the corner of her eye. Insight: Mildly impaired, based on the examiner's clinical impression from the ability to provide information and describe symptoms. Judgment: Mildly impaired, based on the examiner's clinical impression from information garnered during the assessment. Psychomotor Activity: Ms. Cook is ambulatory, but she does exhibit a slow, stiff, and lumbering gait Suicidal /Homicidal Ideation: None reported. Immediate Memory: Within normal limits. Recent Memory: Mildly impaired. Remote Memory: Within normal limits to mildly impaired, based on recall for background. Persistence: Within normal limits to mildly to moderately impaired, based on the ability to stay on task Again, Ms. Cook tends to ramble and provide a great of relevant information. Pace: Flow of the evaluation is slightly affected by some of the aforementioned issues. Social functioning mildly deficient. Diagnosis of generalized anxiety disorder and major depressive disorder, recurrent, mild.

(R. 120) (emphasis added).

[Plaintiff] is alleging a mental disability on the basis of anxiety and depression . . . **[Mental Status Evaluation] (2/4/13)** rated immediate/remote memory, persistence and social functioning as falling essentially [within normal limits] with concentration being only mildly impaired.

(R. 108-09) (emphasis added). Nowhere in the initial level determination, however, could the undersigned locate any indication that *Reilly's* July 31, 2012 opinion was reviewed and considered. At reconsideration, reviewer Capage added only a single line item to the mental evidence findings of fact:

Reconsideration Analysis
MENTAL-
**8/20/12** notes hx of MVA 5/27I11 w head injury. dx- PTSD, traumatic brain injury

(R. 120). However, Dr. Rielly's opinion was dated *July 31*, 2012, and it is obvious this note is not referencing his opinion. Plaintiff was in fact seen by Dr. Shramowiat (a pain specialist) on

August 20, 2012; it is *this* record which references Traumatic Brain Injury and Post-Traumatic Stress Disorder and to which Capage listed under "mental" evidence at the reconsideration level. (R. 732). There is thus no indication that Rielly's July 31, 2012 opinion, findings, and psychiatric evaluation were considered by either of the agency reviewers, at either the initial or reconsideration stage.

This is significant because the ALJ gave two reasons for assigning agency reviewers Shaver and Capage great weight: because they "are experts in psychology and had the opportunity to review all of the available medical evidence." (R. 40). As previously discussed, all five – Coville, Rielly, Corder, Shaver, and Capage – are "experts in psychology," which Defendant acknowledges. (Def.'s Br. at 12).  That factor thus weighs equally, and does not favor the agency reviewers any more than it does the other three psychological experts. Second, although the agency reviewers presumably had the *opportunity* to review all of the available psychological evidence, the undersigned can find no evidence in the record that they *did* review or consider Rielly's opinion and findings, as it is conspicuously not mentioned once in their findings of fact and analyses at both the initial and reconsideration levels.

As a result, the ALJ's reasons for affording the agency reviewers great weight are not supported by substantial evidence or the record. Moreover, even if Shaver and Capage had reviewed Reilly's opinion, their failure to mention it even once in the findings of fact and analyses gives the court no indication why the most probative evidence in this record as to mental conditions did not, or should not, result in greater limitations than mild. This is especially so given that Rielly holds a doctoral degree, is a specialist, examined Plaintiff in person, administered a series of comprehensive psychological tests that no other examining psychologist performed, and found the severity of Plaintiff's conditions ranged from moderate to severe. As

the ALJ relied in significant part on the agency reviewer's opinions, these errors or omissions by the agency reviewers cannot support the ALJ's decision. The ALJ likewise failed to provide good or logical reasons for discounting Dr. Rielly's opinion.

### c. Dr. Rielly

The ALJ gave a single reason for affording Rielly "some weight" – that "records of [Plaintiff's] treating physicians have indicated that symptoms of depression and anxiety had greatly improved with medication." (R. 36, citing Exhibits 7F/8). However, what those notes from Dr. Blum *actually* said, in their totality, was this:

> Depression, agoraphobia and panic attacks all much improved with Zoloft **although she still has some depression and sad quality to her demeanor. She is asked to increase the dose to 150mg, 1½ pill of the 100mg to see if this will increase her mood further.** She will call back for those results and return 6 mo. for [followup].

 (R. 531) (emphasis added). The ALJ thus selectively quoted the portion stating Plaintiff was "much improved," while failing to address the fact that Plaintiff was still depressed and sad enough that Dr. Blum felt it necessary to *increase* her dosage of Zoloft at that same visit. This clearly indicates that despite some improvement, Plaintiff's conditions were not satisfactorily controlled. Moreover, the quoted treatment notes are from January 20, 2011, nearly two years prior to any of the three expert psychological evaluations of Plaintiff. Id.  Indeed, in a Treating Physician questionnaire dated April 5, 2013, Dr. Blum opined that Plaintiff's "severe depression [caused her] **memory [and] concentration [to be] severely compromised**." (R. 741) (emphasis added).

Defendant argues that the treating source statement of Dr. Blum's cannot be considered credible because it reflects "a departure from his notes of examination; provides no context for that change; is dated six months after his last examination; and is a reversal from his treating source statement one year prior." (Def.'s Br. at 13). This argument fails for numerous reasons.

First, the ALJ never made these arguments in determining how much weight to assign Dr. Blum's opinions (R. 30); as such, the Secretary's *post hoc* rationale is of no relevance. Second, as discussed, Dr. Blum's records overall found Plaintiff struggling with depression and anxiety more often than not. The Commissioner has seized on two words – "stable" and "improved" – on just two of numerous occasions, and removed from their full and fair context in his notes, to justify disregarding significant evidence to the contrary. <u>Lewis v. Berryhill,</u> 858 F.3d 858, *869 (4th Cir. 2017) ("An ALJ may not selectively cherrypick facts that support [his decision] while ignoring relevant evidence [to the contrary]."). Third, the fact that Plaintiff from time to time showed variance in her conditions and symptoms is expressly recognized in the regulations as not only normal but also anticipated with mental impairments; hence the requirement for the ALJ to consider variations longitudinally:

> "Longitudinal evidence is extremely important and necessary when evaluating the severity of a mental impairment(s). **A claimant's level of functioning can vary considerably over time.** It is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication to establish severity and probable duration of the impairment(s).

POMS DI 0425505.030 (emphasis added). Taken as a whole, Dr. Blum's treatment notes are not a valid basis for discounting Dr. Rielly's opinion, nor is the ALJ's decision in this respect compliant with the regulations or supported by substantial evidence.

Moreover, Dr. Rielly was the only psychiatric examiner in this record to have actually conducted comprehensive psychological testing beyond just a mental status examination, unlike Coville and Corder. In addition to a mental status exam and clinical interview, Rielly also administered the Beck Anxiety Inventory, the Beck Depression Inventory II, and the Millon Clinical Multiaxial Inventory III. And, as Rielly noted in his opinion, the Anxiety Disorder subscale he administered has been "praised as 'the most sensitive of the MCMI scales as a

measure of psychological distress and disturbance." (R. 687). The results of these clinical tests

were the basis of his diagnoses and opinions that Plaintiff suffered from a number of *moderate*

and *severe* conditions:

> SEVERE PERSONALITY SCALES (Personality Disorders) –
> Anna obtained more than one significantly elevated score among the group of scales that
> reflect severe personality disorders . . . Self-Defeating Personality Disorder, Schizotypal
> Personality Disorder, and Depressive Personality Disorder.

(R. 686).

> MODERATE CLINICAL SYNDROMES
> Anna obtained more than one significantly elevated score among the group of scales that
> reflect clinical symptom disorders of moderate severity, which are described below from
> most prominent to least prominent. Specifically, there were elevations on the following
> scales: Somatoform Disorder, Anxiety Disorder, Dysthymia, and Post-traumatic stress
> Disorder.

> SEVERE CLINICAL SYNDROMES -
> Anna obtained one significantly elevated score among the group of scales that reflect
> severe clinical disorders. Specifically, there was a significant elevation on the scale
> indicating Major Depression.
> The Major Depression scale (Scale CC) measures a more severe affective disorder than
> the Dysthymia scale. Such a disorder would be characterized by **a depressed mood of
> such magnitude that it prevents the individual from functioning.**

(R. 688) (emphasis added). Accordingly, the ALJ's errors in weighing Rielly's opinion and

evidence were not harmless.

### d.  Dr. Corder, Ph.D.

The ALJ did not afford significant weight to the GAF score of 35 given by Dr. Corder for

the same reason as Dr. Rielly's GAF score. (R. 37). However, the ALJ failed to specify how

much weight, if any, was given to Dr. Corder's *opinion*. Id. While Defendant argues that Plaintiff

has not shown what difference it would make if Corder had been assigned "*more* weight"

(emphasis added), Defendant fails to address the fact that his opinion had not been assigned *any*

weight whatsoever. And, the ALJ's failure to specify and assign weight to Corder is in error.

"Unless the Secretary has . . .  sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Gordon v. Schweiker, 725 F.2d 231, *236 (4th Cir. 1984) citing Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977).

What difference it would make as to Corder's opinion alone may be somewhat difficult to specify precisely, because Corder and Rielly's opinions are likely to both jointly impact the decision on remand, and in a similar fashion. However, it is clear that there is a distinct possibility of a different outcome more favorable to Plaintiff. Moreover, as Plaintiff points out, Corder opined in his treatment plan for Plaintiff that deficits in "affect/energy/somatics and safety (due to suicidal thought/behavior)" needed to be addressed. (Pl.'s Rep. at 4, ECF No. 15). Accordingly, additional limitations are a distinct possibility on remand. Because the case must be remanded for other errors regardless, the ALJ upon reconsideration must at minimum assign a weight to Corder's opinion, in accordance with the regulations.

### e. The ALJ failed to comply with 20 C.F.R. § 404.1527(d) in weighing the opinion of Plaintiff's treating physician, Dr. Shramowiat.

The regulations provide, in relevant part, that if "a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2). "When we do not give the treating source's medical opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the

medical opinion." Id. "We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion." Id.

> Instead, the ALJ . . . gave Dr. [Shramowiat]'s opinion little weight because "it was not fully supported by the objective medical signs and findings. Despite the claimant's complaints of pain, she has not had any neurological deficits . . ." (Tr. 34). The ALJ's reasons do not constitute a "good reason" for rejecting a treating source opinion (See 20 C.F.R. § 404.1527(d).

(Pl.'s Br. at 14).

The undersigned agrees. While the ALJ states that Dr. Shramowiat's opinion was "not fully supported by the objective medical signs and findings," he cites only one thing in particular: that Plaintiff "has not had any neurological deficits." (R. 34). However, the ALJ does not explain sufficiently to permit meaningful review why that warrants affording Dr. Shramowiat's opinion little weight. Nor is it apparent. Listing 1.00(B)(1) expressly recognizes that "loss of function may be due to . . . miscellaneous disorders of the spine **with *or without*** radiculopathy or other **neurological deficits**." (emphasis added). It is worth noting that Plaintiff was found to have right cervical radiculopathy (R. 777). As to Listing 1.04 specifically.

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine),

the undersigned observes that there *is* evidence in this record of pain, limitation of motion of the spine, and numerous positive straight leg raising tests. Dr. Wayt noted "questionable positive straight leg raise on the left" on at least numerous occasions from August 2011 to January 2012 as well as decreased but equal cranial nerves (R. 419, 421, 423, 502, 516, 523). On December 5, 2011, Dr. Blum likewise found the straight leg raise test "positive for . . . bilateral pain at 90 degrees," and Plaintiff's low back range of motion was abnormal – "limited 2 degrees to body habitus / some pain." (R. 527). On August 20, 2012, Dr. Shramowiat found a "25% reduction in

left and right cervical rotation;" a positive left straight leg raise test, and both mild hamstring tightness and muscle tightness in the lumbar paravertebral region bilaterally. (R. 679, 777). To the extent that Dr. Schmitt, on one occasion, obtained a negative straight leg raising test and generally more normal musculoskeletal findings (R. 716), the ALJ's obligation was to weigh the competing evidence in accordance with the regulations and by considering the factors – to provide a good reason for disregarding the weight of evidence in Plaintiff's favor. This he did not do, leaving the court unable to "track the ALJ's reasoning and be assured that the ALJ considered the important evidence." Lafferty v. Colvin, 2017 WL 836917, *3, Civil Action No. 1:16-CV-15 (N.D.W.Va. 2017) quoting Diaz v. Chater, 55 F.3d 300, 207 (7th Cir. 1995) (internal citations omitted).

Moreover, Plaintiff alleges pain stemming from a series of conditions: not just from her T12 fracture, but also from painful muscle spasms she experiences in her back, loss of curvature in her neck, degenerative disc disease, arthritis, and depression - as the ALJ was aware. (R. 36) ("She stated that she had total body pain when depressed, and her family doctor had told her this was related to the depression."); see also R. 39. The ALJ has thus failed to consider that Plaintiff has more than one condition that causes her pain, and improperly discounted them all for reasons that do not have equal relevance to all. And even if the ALJ's speculation about her T12 fracture having healed were correct, that would not relieve him of the obligation to consider the other conditions contributing to Plaintiff's back pain. Because the ALJ gave only one evidentiary reason for discrediting Dr. Shramowiat that lacks even facial validity, and because his second reason is speculation (that Plaintiff's compression fracture could have healed since the imaging studies were done (R. 35)), his decision to afford little weight to Dr. Shramowiat cannot be affirmed.

This error was likewise not harmless because Dr. Shramowiat, Plaintiff's treating physician, opined that Plaintiff's complaints of pain were reasonable in light of the diagnostics and imaging showing her underlying conditions. Dr. Shramowiat is a pain specialist – the *only* specialist of this type to have opined as to Plaintiff's limitations from pain. Dr. Shramowiat specifically listed all of the diagnostics and imaging studies that supported his opinion. (R. 779). He opined Plaintiff experienced moderate pain, and prescribed Plaintiff Norco (hydrocodone acetaminophen), a narcotic pain reliever which is used to relieve moderate to severe pain (R. 777), which is supportive evidence of Plaintiff's subjective complaints of pain. Stump v. Colvin, Case No. 2:15-CV-76, 2016 WL 7077084, *17 (N.D.W.Va. Nov. 16, 2016).

In spite of this, the ALJ determined that Dr. Shramowiat's opinion should be disregarded and Plaintiff's subjective complaints found not credible. Dr. Shramowiat's opinion was not reviewed by either of the agency reviewers (whom the ALJ gave great weight) in determining Plaintiff's conditions and her limitations, as it was written on August 5, 2014 – more than a year after the last agency reviewer had reviewed the case file in 2013 for reconsideration. This error also caused Dr. Shramowiat's limitations to be improperly disregarded as well. Although the ALJ found no more than mild limitations in concentration, persistence, or pace due to *mental* conditions, Dr. Shamrowiat opined that the *pain* Plaintiff experienced would cause "deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere) due to pain." (R. 780). Accordingly, this too must be considered and discussed on remand, because it is not clear that the ALJ has considered the conflicting evidence. contra Laffterty, 2017 WL 836917 at *5 (internal citations omitted).

   **f.   Whether the ALJ erred in finding Plaintiff's depression and anxiety to be non-severe impairments**

When a claimant's psychological limitations are implicated, the ALJ must follow a "special technique" in evaluating the impairment. First, the ALJ must "evaluate [a claimant's] pertinent symptoms, assigns and laboratory findings to determine whether [a] medically determinable mental impairment" is present. 20 C.F.R. § 404.1520a(b). When a medically determinable mental impairment is found, the ALJ must then determine if the impairment is severe. 20 C.F.R. §404.1520a(b)(2). A severe impairment is one that "significantly limits [a claimant's] mental ability to do basic work activities," 20 C.F.R. §404.1520(c). Severity of a mental impairment concerns the extent to which it "interferes with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404.1520a(c)(2). The degree of a claimant's functional limitations from an impairment are rated in four areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404, Subpart P, Appendix 1, Listing 12.04(B). These are rated on the following five-point scale:

    a.  *No limitation (or none).* You are able to function in this area independently, appropriately, effectively, and on a sustained basis.

    b.  *Mild limitation.* Your functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.

    c.  *Moderate limitation.* Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.

    d.  *Marked limitation.* Your functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.

    e.  *Extreme limitation.* You are not able to function in this area independently, appropriately, effectively, and on a sustained basis.

20 C.F.R. § 1520a(c)(4), 20 C.F.R. § 404, Subpart P, Appendix 1, Listing12.00(F)(2). If the degree of limitation for these four areas is "none" or "mild," then the impairment is "generally" considered non-severe. 20 C.F.R. § 404.1520a(d)(1).  An impairment is non-severe "if it is a slight abnormality which has such a minimal effect on the individual that it would not be

expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

The ALJ found that Plaintiff's medically determinable mental impairments of Generalized Anxiety Disorder and Major Depressive Disorder, "considered singly and in combination do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe." (R. 23). Defendant argues that a failure to find a severe impairment at step two is harmless error so long as the ALJ includes the appropriate limitations in his residual functional capacity. (Def.'s Br. at 10). Plaintiff argues that the ALJ clearly did not include mental limitations in his RFC, so the error was not harmless. (Pl.'s Rep. at 2).

The ALJ stated that the "evidence indicates no more than mild functional impairments because of her depression and anxiety," then went on to reiterate that Plaintiff's mental impairments were not "severe." (R. 40). The ALJ did not explicitly discuss or state whether he had found no limitations whatsoever to Plaintiff's activities of daily living, social functioning, concentration, persistence, or pace. This is not harmless error for three reasons.

First, errors in the weight analyses prior in the sequential process cause the undersigned to be unable to conclude that this RFC *is* appropriate, as any change in the assignment of weight would almost certainly result in a change in the RFC, given the opinions. Second, the ALJ's justification for "no more than mild" functional mental impairments factored heavily on the state agency reviewers who did not even review Rielly's report and opinion or Shamrowiat's opinion, both of which contained limitations in concentration, persistence, or pace, albeit as a result of different impairments – Rielly as a result of mental and emotional conditions, and Shamrowiat as a result of pain from physical conditions. Of particular note is the ALJ's statement that the

Plaintiff's *mental* impairments were not severe. Yet, treating physician Dr. Shamrowiat noted that Plaintiff's attention and concentration were *also* significantly impacted by *pain*. There is no indication that the ALJ properly factored limits from both mental impairments and pain from physical impairments as well in assigning no limitations whatsoever to any of those domains. Plaintiff's situation here is thus distinct from <u>Shartiger v. Colvin,</u> because it cannot be said that the ALJ properly considered limitations in fashioning the RFC. 2014 WL 1054241, *28, Civil Action No. 5:13-CV-71 (N.D.W.Va. 2014).

Third, as Plaintiff points out, a change in limitations in concentration, persistence, or pace would also affect the ALJ's finding that Plaintiff could return to her past relevant work - semiskilled positions which required abilities in concentration, persistence, and pace. Remand for inclusion of all of Plaintiff's limitations – once the other errors have been corrected – is therefore appropriate. <u>Mauzy v. Astrue,</u> Case No. 2:08-CV-75, 2010 WL 1369107 at *17 (N.D.W.Va. March 30, 2010).

## VII.   <u>RECOMMENDATION</u>

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is contrary to the law and unsupported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 11) be **GRANTED**, Defendant's Motion for Summary Judgment (ECF No. 13) be **DENIED**, and the decision of the Commissioner be vacated and this case be **REMANDED** pursuant to for further proceedings.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such

objections. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Additionally, as this report and recommendation concludes the referral from the District Court, the Clerk is further **DIRECTED** to terminate the magistrate judge's association with this case.

Respectfully submitted this December 27, 2017.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE

44